United States District Court
Southern District of Texas
**ENTERED**
June 23, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| **TIG INSURANCE COMPANY SUCCESSOR BY MERGER TO AMERICAN SAFETY INDEMNITY COMPANY,** | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 5:18-CV-00191** |
| **WOODSBORO FARMERS COOPERATIVE, *et al.*,** | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

The outstanding issue in this case is whether Plaintiff TIG Insurance Company, successor by merger to American Safety Indemnity Company, (hereinafter, "TIG") has a duty to indemnify its insured, Defendant E.F. Erwin, Inc. ("Erwin"). For the foregoing reasons, the Court finds that TIG has no duty to indemnify Erwin.

## Factual and Procedural Background

This declaratory judgment action arises from a construction dispute at Defendant Woodsboro Farmers Cooperative's ("Woodsboro") grain handling facility in Woodsboro, Texas. (Dkt. 1 at 2.) In 2013, Woodsboro and Erwin entered into a construction contract whereby Erwin would construct for Woodsboro two grain tanks (silos) and related equipment. (Dkt. 1, Attach. 2.)[1] Erwin subcontracted with AJ Constructors, Inc. ("AJ") to provide labor and materials for the construction. (Dkt. 1, Attach 3 at 2.) However, this subcontract specified that Erwin was in sole

[1] The Parties have labeled their sub-filings as "Exhibits." However, the Court will use "Attachment" to refer to these sub-filings in accordance with the official docket entries.

control of the means and methods of construction. (*Id.*) According to Woodsboro, "[a]lthough [Erwin] completed the construction of the grain silos, the work was defective and not in accordance with the terms of the contract . . ." (Dkt. 1, Attach. 1 at 5.)[2] Because of this breach, and Erwin's failure to indemnify Woodsboro, Woodsboro brought suit in the 135th Judicial District of Refugio County in 2014 (the "Underlying Action"). *Id.*

In September of 2016, TIG sent a letter to Erwin stating it was denying coverage for Erwin in the Underlying Action. (Dkts. 64, 69.) Erwin was ultimately defended in the Underlying Action by AJ's insurance company, Landmark American Insurance Company, as an additional insured. *Id.* The Underlying Action proceeded to arbitration on August 21, 2018, where the Construction Industry Arbitration Tribunal of the American Arbitration Association (the "Arbitration Panel") found that Woodsboro's grain silos had been defectively constructed. (Dkts. 64, 69.) The Arbitration Panel also found that AJ's work was negligently performed and was not in compliance with the terms of the subcontract agreement. *Id.* Though the arbitration award was intended to represent "a full settlement of all claims and counterclaims submitted" (Dkt. 99, Attach. 4), Woodsboro later filed a motion to amend the award seeking to add taxable costs. (Dkt. 6, Attach. 7.)

In December of 2018, TIG filed a Complaint for Declaratory Judgment (Dkt. 1) pursuant to the Declaratory Judgment Act. *See* 28 U.S.C. § 2201. TIG's Complaint (Dkt. 1) sought a declaratory judgment from this Court stating that: (1) it had no duty to defend its insured, Erwin, in the Underlying Action; and (2) it has no duty to indemnify Erwin or to pay Woodsboro for any relief awarded against Erwin. (Dkt. 1 at 8.) Woodsboro then made a second request to the

[2] Woodsboro identified one of the subcontractors as responsible for the defects in the grain silos. However, Woodsboro asserts that the terms of its contract with Erwin guarantee that Erwin would indemnify Woodsboro for any damages caused by subcontractors. (Dkt. 1, Attach. 1 at 5.)

Arbitration Panel to amend its award, and the Arbitration Panel responded that if the Parties wished to request a modification or clarification, that they must do so by January 16, 2020. (Dkt. 118.) No final judgement had been entered in the Underlying Action at that time.

While Woodsboro's request for modification was pending, this Court ruled on the Parties' cross motions for summary judgment (Dkts. 99, 103), finding that TIG had no duty to defend Erwin. (Dkt. 121.) However, the Court declined to rule on the issue of indemnity, noting that "this Court will wait for the resolution of the [Underlying Action] before ruling on TIG's duty to indemnify." (Dkt. 121 at 15.) Woodsboro responded by filing a Motion to Dismiss (Dkt. 124) arguing that, per the Court's order (Dkt. 121), the issue of indemnity was not yet ripe for adjudication and thus the Court lacked subject matter jurisdiction. (*Id.* at 2.) Before the Court ruled on that pending Motion (Dkt. 124), a final judgment was entered in the Underlying Action. (Dkt. 126, Attach. 1.) This final judgment ripened TIG's declaratory judgment action and the Court held that Defendant's Motion to Dismiss (Dkt. 124) was thereby moot as a matter of law.[3] *See* (Dkt. 127.)

On October 18, 2022, the Court notified the Parties that it intended to address the issue of indemnification on summary judgment pursuant to Federal Rule of Civil Procedure 56(f). (Dkt. 127.) The Parties were provided the opportunity to file supplemental briefing but were instructed that "[i]f no such briefing is received by the Court, the Court will exercise the right to issue judgment based on the filings currently on the record"—namely, the unresolved issues from the

[3] The final judgment confirmed that Woodsboro would recover from Erwin a total amount of $1,300,241.39. (Dkt. 126, Attach. 1.) This award included damages, prejudgment interest, attorney's fees, and court costs. (*Id.*) Additionally, Erwin would be responsible for $14,362.99 of the total fees paid to the Arbitration Panel. (*Id.*) The final judgment also determined that Erwin would recover a total of $1,079,963.81 from its subcontractor, AJ.

previous cross-motions for summary judgment (Dkts. 99, 103). *See* (Dkt. 127.) Plaintiff filed additional briefing on November 1, 2022 (Dkt. 128), asking that the Court rely only on the briefing submitted in support of the previous motions for summary judgment (Dkts. 99, 103) as "there is nothing new or different for the parties to address which they did not have the opportunity to address in their summary judgment briefing last year." (Dkt. 128.)

## Legal Standards

### A. *Sua Sponte* Summary Judgment

District courts may grant summary judgment *sua sponte*. *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018) (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir. 1994)). However, they "must give the parties notice and a reasonable time to respond." *Id.* (internal quotations omitted) (citing FED. R. CIV. P. 56(f)). Summary judgment is appropriate if, when viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015) (internal quotations omitted) (citing FED. R. CIV. P. 56(a)); *Harrison Co., L.L.C. v. A-Z Wholesalers, Inc.*, 44 F.4th 342, 346 (5th Cir. 2022). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party . . . [and a] fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conclusory allegations are insufficient to defeat a motion for summary judgment, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (citation omitted), as are unsubstantiated assertions, improbable inferences, or unsupported speculation. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

**B. Declaratory Judgment Actions**

The Declaratory Judgment Act allows parties to bring an action in federal court seeking a declaration of its "rights and other legal relations." 28 U.S.C. § 2201. "Any such declaration shall have the force and effect of a final judgment or decree . . ." *Id.* The Fifth Circuit has "set forth three inquiries that district courts must make to determine whether to adjudicate a declaratory judgment action: first, whether the case is justiciable; second, whether the court has authority to grant declaratory relief; and third, whether the court should exercise its discretion to decide the action." *Canal Ins. Co. v. XMEX Transp., LLC*, 1 F. Supp. 3d 516, 523 (W.D. Tex. Mar. 4, 2014) (citing *Orix Credit Alliance v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000)); *AXA RE Prop. & Cas. Ins. Co. v. Day*, 162 Fed. Appx. 316, 319–21 (5th Cir. 2006) (citations omitted).

**C. The Duty to Indemnify**

In diversity cases, Texas substantive law governs the evaluation of insurance contracts. *VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 456 (5th Cir. 2011) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). According to the Texas Supreme Court, an insurer generally has two obligations under an insurance policy: a duty to defend, and a duty to indemnify. *PPI Techs. Servs., LP v. Liberty Mut. Ins. Co.*, 2012 WL 130389, at *5 (S.D. Tex. Jan. 17, 2012) (quoting *D.R. Horton-Texas Ltd. v. Mkt. Int'l Ins. Co. Ltd.*, 300 S.W.3d 740, 743 (Tex. 2009)). "The duty to defend and the duty to indemnify are distinct and separate duties" where the "existence of one does not necessarily depend on the existence or proof of the other." *D.R. Horton-Texas Ltd.*, 300 S.W.3d at 743–45. In other words, even if the insurer has no duty to defend its insured, it may nevertheless have a duty to indemnify. *See Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 254 (5th Cir. 2011). Yet, "[a]s courts have consistently held, it is almost impossible to establish a duty to indemnify if there is no duty to defend . . ." as under Texas law,

"the duty to defend is broader than the duty to indemnify." *Paloma Res., LLC v. Axis Ins. Co.*, 452 F. Supp. 3d 579, 585 (S.D. Tex. Apr. 3, 2020) (internal quotations omitted) ("Logic and common sense dictate that if there is no duty to defend, then there must be no duty to indemnify.").

The duty to indemnify means that the insurer "will pay all covered claims and judgments against an insured." *Id.* at 253 (citing *D.R. Horton–Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009)); 14 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 200:3 (3d ed. 2009)). In contrast to the duty to defend, "an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all." *Colony Ins. Co.*, 647 F.3d at 253 (citing *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997)). This is because the duty to indemnify "is triggered by the actual facts establishing liability in the underlying suit, and whether any damages caused by the insured . . . are covered by the terms of the policy." *Id.* at 253 (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex. 1997)).

## **Discussion**

TIG argues it is entitled to summary judgment on the issue of indemnification because no part of the judgment provided in the arbitration award is covered by the relevant insurance policy. (Dkt. 99 at 1–2.) TIG contends that the arbitration award was for the cost of replacing defectively constructed grain silos and that this "faulty work" claim is not the type of physical injury to property that would bring the damages within the scope of coverage. (*Id.*)

Woodsboro argues that TIG does, in fact, have a duty to indemnify Erwin for the damages in the arbitration award. (Dkt. 103 at 1–3.) Woodsboro asserts that due to the negligent construction of the grain silos, wind and weather were able to cause extensive damage necessitating deconstruction of the silos and then reconstruction with additional replacement pieces. (*Id.*)

Woodsboro attempts to avoid the policy exclusions trap by contending that there was damage to pieces of the silos that were not the subject of Erwin's (or the sub-contractor's) defective construction. (*Id.*)

**A. Policy Coverage**

In analyzing this case, the Court must first determine whether the claims fall within the broad scope of the insurance policy at issue. *See Liberty Surplus Ins. Corp. v. Allied Waste Sys., Inc.*, 758 F. Supp. 2d 414, 420 (S.D. Tex. Dec. 20, 2010) (citing *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999)). If the Court makes this determination, it must then decide whether a policy exclusion is applicable. *See id.* Finally, if it decides that a policy exclusion applies, it must ascertain whether an exception to the policy exclusion also applies, thus bringing the claim back within coverage. *Id.*

**i. Policy Coverage: Generally**

As a general matter, the party asserting that coverage exists—typically the insured—bears the burden of proof. *Evanston Ins. Co. v. Lapolla Indus., Inc.*, 93 F. Supp. 3d 606, 612 (S.D. Tex. 2015). Here, Woodsboro is asserting that the insurance policy from TIG should cover the arbitration award against Erwin. As such, it is Woodsboro's burden to show that the insurance policy at issue covered the defective silos.

Erwin was insured by American Safety Indemnity Company ("ASIC") from February 27, 2013, to February 27, 2014, under policy number ESL1002066-1301 (hereinafter, the "Policy"). (Dkt. 1, Attach. 4.) As part of the Policy, ASIC agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Dkt. 1, Attach. 4 at 8.) However, the insurance only applied to "bodily injury" and "property damage" if:

> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"
> (2) The "bodily injury" or "property damage" occurs during the policy period; and
> (3) Prior to the policy period, no insured . . . knew that "bodily injury" or" property damage" had occurred . . . .

(Dkt. 1, Attach. 4 at 8.) The second and third elements are not in dispute. The parties only disagree on whether the damage to the silos is considered "property damage" caused by an "occurrence" under the meaning of the Policy.[4]

"Property damage" is defined in the Policy as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[5]

(Dkt. 1, Attach. 4 at 22.) The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Dkt. 1, Attach. 4 at 21.)

**a. Has there been an "occurrence"?**

The first issue is whether there was an "occurrence" that would trigger coverage. TIG argues that there can be no occurrence when "the claimed damages were the natural and expected result of the insured's actions or were 'highly probable.'" (Dkt. 99 at 19) (citing *Greystone Multi-Family Builders, Inc. v. Gemini Ins. Co.*, 2018 WL 1579477, at *3 (S.D. Tex. April 2, 2018). The claimed damages—the leaking silos—were "highly probable" and "certainly the natural and

---

[4] "Bodily injury" is defined by the Policy as "bodily injury, sickness or disease sustained by a person . . ." (Dkt. 1, Attach. 4 at 19.) Woodsboro has not claimed—and the Arbitration Panel did not find—that the defective silos caused any "bodily injury, sickness or disease." The Court therefore limits its considerations of the Policy's coverage to what can be included under the "property damage" prong.

[5] Pertinent definitions for the Policy are found in Section V. (Dkt. 1, Attach. 4 at 19.)

expected result of a contractor's failure to follow specifications in the construction of such silos." (Dkt. 99 at 19.) Woodsboro disagrees, arguing that "AJ's poor workmanship—in both failing to install and properly tighten several key bolts—permitted the silos to flex and work in the wind, causing subsequent damage to numerous components." (Dkt. 103 at 2.)

Texas law "does not foreclose treating property damage stemming from faulty work as a covered 'occurrence.'" *Liberty Ins. Corp. v. Omni Constr. Co., Inc.*, 2022 WL 4454368, at *2 (S.D. Tex. Sept. 23, 2022) (citing *Lamar Homes, Inc. v. Mid-Cont. Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007)[6] (holding that insured's faulty workmanship can constitute an "'occurrence' when 'property damage' results from the 'unexpected, unforeseen or undesigned happening or consequence' of the insured's negligent behavior")). Under the Policy, "occurrence" is defined, in part, as an "accident." While "accident" is left undefined, Texas law dictates that "[t]erms that are not defined in a policy are given their generally accepted or commonly understood meaning." *Lamar Homes, Inc.*, 242 S.W.3d at *8 (citing *W. Reserve Life Ins. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953)).

Courts have stated that the ordinary meaning of "accident" is "a fortuitous, unexpected, and unintended event." *Encompass Indem. Co. v. Steele*, 2022 WL 3691045, at *3 (N.D. Tex. Aug. 24, 2022) (citing *Lamar Homes, Inc.*, 242 S.W.3d at *8) (analyzing "accident" in the context of the duty to defend). An intentional tort cannot be an accident. *Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co.*, 712 F. Supp. 2d 628, 637 (S.D. Tex. May 17, 2010). However, "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result. . . ." *Id.* (citing *Lamar Homes, Inc.*, 242 S.W.3d at 5). Because both AJ and Erwin followed or attempted

[6] *Lamar* was analyzed under the lens of the "duty to defend." Nevertheless, the Court feels the interpretation of specific terms of the contract (ultimately to determine whether coverage exists) is applicable to analyzing the duty to indemnify here.

to follow instructions for completion of the silos, the property damage to the silos was an "accident" and therefore an "occurrence" under the meaning of the Policy. (Dkt. 103 at 11–12.)

Both the Fifth Circuit and the Supreme Court of Texas agree that "claims for damage caused by an insured's defective performance or faulty workmanship may constitute an occurrence when property damage results from the unexpected, unforeseen or undesigned happening or consequence of the insured's negligent behavior." *Lamar Homes, Inc.*, 242 S.W.3d at *16 (Tex. 2007) (internal quotations omitted) (citing *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 725 (5th Cir. 1999)). Here, the numerous defects found on the silos after construction was complete were both unexpected and unintended. As Erwin testified during his deposition, "we expect [the silos] to be built both structurally—with structural integrity and also we want them to look good." (Dkt. 103, Attach. 6 at p. 33.) It cannot be said that the defects were the "natural" or "expected" result of this construction; the evidence before the Court shows that Erwin, his company, and his subcontractor intended and expected the construction of the silos to be done correctly. *See, e.g.*, (Dkt. 103, Attach. 7 at p. 11) ("And then when you buy these bins, they come with erection manuals so to speak from the manufacturer . . . . [a]nd he was supposed to erect it according to those specifications."). The property damage to the silos can thus be said to have come from an occurrence.

**b. Is there "property damage"?**

For the defective silo construction to be covered by the Policy, it must be considered "property damage." According to TIG, Erwin's "faulty work caused by its failure to follow specifications is not property damage . . . under the Policy and settled Texas law." (Dkt. 99 at 13) (internal quotations omitted). This would relieve TIG of any duty to indemnify Erwin for the arbitration award against him. (*Id.*) Woodsboro argues in response that "[t]he record abounds with

examples of physical injury to the grain bins" and "also evidence of loss of use of property." (Dkt. 103 at 9.) Woodsboro further claims "there should be no doubt [it] suffered property damage." (*Id.*)

Texas courts "look at the language of the policy because [courts] presume parties intend what the words of their contract say." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (citations omitted). As previously noted, "property damage" is explicitly defined by the Policy as (a) physical injury to tangible property, or (b) loss of use of tangible property that is not physically injured. (Dkt. 1, Attach. 4 at 22.) "Physical injury," "tangible property," and "loss of use" are left undefined by the Policy. As such, these terms will be "given their plain, ordinary, and generally accepted meanings absent some indication of a different intent." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015) (citing *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990)).

**i. Physical Injury to Tangible Property**

First, the Court will consider whether there has been a "physical injury to tangible property."[7] The Supreme Court of Texas has provided an analysis of this phrase in a similar insurance contract provision:

> The policy covers "injury", which means "[t]he violation of another's legal right", or more generally, "[a]ny harm or damage." BLACK'S LAW DICTIONARY 905 (10th ed.2014); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1164 ("an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm: wrong[;] a violation of another's rights for which the law allows an action to recover damages or specific property or both: an actionable wrong[;] hurt, damage, or loss sustained").

[7] "Tangible property is commonly understood to be property that is capable of being handled or touched." *Cook v. Admiral Ins. Co.*, 2010 WL 2605256, at *3 (N.D. Tex. June 29, 2010), *aff'd on other grounds*, 438 F. App'x 313 (5th Cir. 2011) (citing *Lay v. Aetna Insurance Company*, 599 S.W.2d 684 (Tex. Civ. App.—Austin 1980)). That the silos are considered "tangible property" does not appear to be in dispute.

> But the policy does not cover every injury; it covers only "physical injury". "Physical" means "[o]f, relating to, or involving material things; pertaining to real, tangible objects". BLACK'S LAW DICTIONARY 1331 (10th ed.2014); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1706 ("of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary").

*U.S. Metals, Inc.*, 490 S.W.3d at 24. Clearly, a grain silo falls within the realm of "material things" as opposed to the realm of the mental, moral, spiritual, or imaginary. The question remains then whether the grain silo suffered "harm or damage." This analysis requires careful consideration of the summary judgment evidence before the Court.

"With respect to 'physical injury to tangible property,' Texas law draws a distinction between cases where defective installation requires only repair to fix the defective work and cases where the defective work causes physical damages to other parts . . . The latter is considered 'physical injury to tangible property,' but the former is not." *Mid-Continent Cas. Co. v. McCollum Custom Homes, Inc*., 461 F. Supp. 3d 516, 523 n.3 (S.D. Tex. May 20, 2020), *appeal dismiss.*, 2020 WL 8569300 (5th Cir. 2020). Here, the defective silo construction is more akin to "defective installation" requiring repair than defective work which caused physical damage to *other* property.

Other cases have reached a similar result. In *Building Specialties, Inc.*, a coverage dispute involving a residential construction project, the plaintiff alleged that duct work installed was defective and had to be replaced. *See Bldg. Specialties, Inc.*, 712 F. Supp. 2d at 645. Specifically, "[t]here were no allegations of any resulting physical damage to the duct work itself or to other parts of the house or to the loss of use. The petition sought damages only for the cost of repairing the defective duct work." *Id.* There, the court found that the petition did not properly allege "property damage" under a theory of physical injury.

In our case, Woodsboro alleges that "the record abounds with examples of physical injury to the grain bins . . . ." and particularly focuses on the damage to the roof, which it claims was

caused by defective work in other areas of the silo. (Dkt. 103 at 9.) Yet, the evidence before the Court demonstrates that the entirety of the silo was defectively constructed and required repairs. As Buck Pitcock ("Pitcock")[8] of Pitcock Supply, Inc. wrote, "[o]ur decision to jack tanks down and put back to OEM specifications was the only decision that would have corrected all the deficiencies in a prudent manner." (Dkt. 99, Attach. 5 at p. 170.)[9] There was not one defective part which harmed other areas of the silo; indeed, "[e]very single major component that makes up a grain bin had problems . . . All components of roofs had problems leading to the tanks leaking." (Dkt. 99, Attach. 5 at p. 162.) Pitcock stated in his deposition that "this construction, this stuff was shaking and rattling and moving . . . . So this stuff was deteriorating in our wind as we speak or spoke at that point . . . . When they were erected, they had poor workmanship." (Dkt 103, Attach. 5 at pp. 133–34.) Like the duct work in *Building Specialties, Inc.*, the defective silos had to be replaced in its entirety.

The Court also considered the affidavit of Roxann Wiginton ("Wiginton"), Woodsboro's general manager at the time of the construction and Woodsboro's corporate representative at the arbitration proceedings. *See* (Dkt. 103, Attach. 2.) According to Wiginton,

> Following project completion on November 1, 2013, Woodsboro noticed some minor water intrusion in the bins. . . there were also instances of bolts that had not been tightened down sufficiently, that had come loose, that had come out, or that had never been installed.

(*Id.* at ¶¶ 11–12.) The affidavit goes on to state that:

> Despite Erwin's efforts, the bins could not be made watertight . . . Upon inspection, Mr. Pitcock identified numerous issues with the bins. Bolts were missing or not properly tightened; there were numerous gaps in the tank walls and roofs that allowed water to intrude; some of the tank stiffeners

[8] Pitcock was recommended by the grain silo manufacturer to Woodsboro to determine the necessary steps to make the defectively constructed silos watertight.

[9] When citing to deposition transcripts, the pincite will refer to the deposition page number, rather than the document page number, using a "p" or "pp" designation.

> had been installed incorrectly; and expanding foam had been used to seal gaps in the tank. . . . [Mr. Pitcock was] very concerned about the structural stability of the bins and the possibility they might come apart in the wind."

(*Id.* at ¶¶ 14–16.) While this evidence helps show the state of the silos at the end of their construction, it does nothing to show that *injury*, under the meaning of the Policy, has occurred.

In *U.S. Metals*, the Texas Supreme Court found that the element of "physical injury" in a standard commercial liability policy was not met merely because a faulty, but otherwise unharmful, component was installed in a diesel unit. *U.S. Metals, Inc.*, 490 S.W.3d at 27. The court found that because the installer had identified and replaced the defective components prior to placing its units into service due to a "careful and cautious" approach, the insured was not "entitled to indemnity for the costs of remedying the installation of faulty [components]."[10] *Id.* This case is analogous to *U.S Metals*, in that a defective component was installed with the *future potential* to cause harm or injury to other property but was replaced before it could actually do so. The Arbitration Panel specifically details that the damages against Erwin were awarded for "deconstruction and reconstruction" and "lost profit"—which is the "cost of remedying the installation of faulty [components]." *Id.*; (Dkt. 126, Attach. 1 at 6.) The silos were not harmed or damaged. They were simply ill constructed in the first place.

Water leakage that Woodsboro claims occurred *could* be the type of tangible, present injury that is contemplated under "physical injury." Yet, no evidence has been presented that the leak *caused* any injury to the already defectively constructed silos or Woodsboro's other property. In fact, Woodsboro never put grain in the silos because of the leakage. *See* (Dkt. 126, Attach. 1 at 6) ("Woodsboro was damaged by not being able to place the grain bins in service for the 2013 harvest

[10] While this holding seemingly created a "perverse" incentive under the policy to not replace defects until after any leaks cause physical injury to property, the *U.S. Metals, Inc.* court ruled based on what they considered to be the "clear" text of the policy. *Id.*

season."). Accordingly, there was no "physical injury" under the meaning of the Policy to the silos as a result of the leak.

**ii. Property Damage: Loss of Use of Tangible Property**

Even though Woodsboro's property was not "physically injured," it could nevertheless have suffered property damage under the language of the Policy through the "loss of use of tangible property that is not physically injured." (Dkt. 1, Attach. 4 at 22.)

"Texas courts have continued to find that as a matter of law . . . loss of use in the property damage insurance context must be something more than purely economic loss to trigger coverage . . . ." *Nat'l Fire Ins. of Hartford v. C. Hodges & Assocs., PLLC*, 825 F. Supp. 2d 792, 798 (W.D. Tex. Oct. 27, 2011) (internal quotations omitted) (citing *Daneshjou Daran, Inc. v. Truck Ins. Exch.*, 2009 WL 2410932 at *2 (Tex. App.—Austin Aug. 5, 2009)). For example, a tenant who had access to leased premises at all relevant times, though he experienced economic harm, could not argue "loss of use." *Id.* at 799 ("the petition does not allege that the Tenants were denied use of their property; it only alleges that they lost revenue"). Additionally, "[d]amages for repairs or for the cost of getting what one desired, but did not receive, are not the same as damages for loss of use of the thing desired." *Cook*, 2010 WL 2605256, at *3.

TIG argues that *Cook* stands for the proposition that property that was never capable of being used and has not been used cannot qualify as "loss of use." (Dkt. 99 at 17.) In *Cook*, the plaintiff—an oilfield repair company hired to oversee the running of casing on a well—was sued after it removed too much casing, causing the well to be completed at a shallower depth than specified.[11] *Id.* The plaintiff's insurance company argued that the underlying claims against the

[11] The plaintiff sought both defense and indemnification in this suit from its insurance company. *Id.* at *1.

plaintiff were not covered by the applicable insurance policy, as there was no "loss of use" of the well. *Id.* at *3. The court agreed, and ultimately found that to be considered loss of use of tangible property, the well must have been in use *prior* to the damage. *Cook,* 2010 WL 2605256, at *3.[12]

However, the court's conclusion relied on the fact that the underlying lawsuit did not allege damages for loss of use.[13] Here, in contrast, Woodboro did attempt to claim "loss of use" in the underlying suit. *See* (Dkt. 126, Attach.1 at 4.) But the Arbitration Panel did not ultimately award Woodsboro any damages for "loss of use" of the defectively constructed silos, as:

> The parties also provided conflicting testimony regarding the losses incurred by Woodsboro due to the inability to use the bins for the 2013 harvest. Woodsboro provided evidence through its manager [Wiginton] that its loss was $617,787.13. Both Erwin and AJ presented testimony from retained experts that contradicted Woodsboro's testimony on this element of damage. Erwin's expert, A. L. Hutson, questioned the testimony of Ms. Wiginton and testified that she failed to identify costs associated with grain storage and used the highest number realized on grain sales in her calculations. AJ's expert on this subject, Bruce Babcock, testified regarding the overall grain crop in 2016 and also provided calculations illustrating the capacity of Woodsboro's storage facilities and the additional amount of grain that could have been stored.

(Dkt. 126, Attach.1 at 5.) The Arbitration Panel found that the project was not timely completed by Erwin, and that Woodsboro was damaged by not being able to place its bins in service during

---

[12] "The well completed at the specified depth had not only not been used but could not have been used. It was not poised ready to put in action or service. It simply did not exist at the time of the breach or when the reworking was done . . . Damages for repairs or for the cost of getting what one desired, but did not receive, are not the same thing as damages for loss of use of the thing desired." *Cook,* 2010 WL 2605256, at *3.

[13] Additionally, the Fifth Circuit did not address this interpretation of "loss of use" on appeal. *Cook v. Admiral Ins. Co.*, 438 F. App'x 313, 317 (5th Cir. 2011) ("We need not pursue [the issue of loss of use] further, however, because we affirm on different grounds."). There has been at least one other District Court that disagrees with *Cook*'s analysis of "loss of use" under identical insurance policy language. *See Kinsale Ins. Co. v. ETOPSI Oil & Gas LLC*, 477 F. Supp. 3d 555, 559 (E.D. Tex. Aug. 7, 2020), *aff'd sub nom. Kinsale Ins. Co. v. McBride Operating L.L.C.*, 855 F. App'x 234 (5th Cir. 2021) ("One court has held that the installation of a faulty well cannot be a 'loss of use of tangible property' unless the well had been in use before the breach … This court does not endorse that view.").

the 2013 harvest season. But this award was specifically labeled as "los[t] profit for late delivery of project" instead of the "loss of use" damages Woodsboro plead. (Dkt. 126, Attach.1 at 5.) This award is thus for *economic* loss and was not for property damage under the meaning of the policy. *See Great Am. Lloyds Ins. Co. v. Mittlestadt*, 109 S.W.3d 784, 787–88 (Tex. App.—Fort Worth, 2003) (noting that "Texas courts have repeatedly held that economic losses do not constitute 'property damage' within the meaning of a general liability policy"); *Daneshjou Daran, Inc. v. Truck Ins. Exch.*, 2009 WL 2410932, at *2 (Tex. App.—Austin, Aug. 5, 2009) (holding that in a case where loss of the plaintiffs' investment and anticipated profits was claimed, "such factual allegations do not establish property damage").

**B. Do exclusions to the Policy preclude coverage?**

Even if the Policy had covered the defective silo construction, the damages claimed here are explicitly excluded from the Policy's coverage. Generally speaking, "the purpose of a liability insurance coverage for a builder is to protect the insured from liability resulting from property damage (or bodily injury) caused by the insured's product, but not for replacement or repair of that product." *David Lewis Builders, Inc. v. Mid-Continent Cas. Co.*, 720 F. Supp. 2d 781, 785 (N.D. Tex. Apr. 1, 2010), *aff'd*, 410 F. App'x 787 (5th Cir. 2011) (citing *T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co.*, 784 S.W.2d 692, 694–95 (Tex. App.—Houston [14th Dist.] 1989, writ denied)). The plain language found in Section I(2)(j) of the Policy (Exclusions—Damage to Property) comports with this general understanding. Namely, the Policy explicitly excludes:

> "Property damage to…
>
> (5) The particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations…or
>
> (6) That particular part of any property that must be *restored, repaired or replaced* because "your work" was incorrectly performed on it.

(Dkt. 1, Attach. 4 at 12) (emphasis added).

The exclusion in I(2)(j)(5) explicitly removes from coverage property damage that arose from performing operations. Identical contractual language has been analyzed by other courts, where it has been explained that "[t]he ordinary meaning of 'performing operations' is the active performance of work." *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009) (finding that the (j)(5) exclusion only applies to damage caused during active physical construction). The Court has already concluded that the property damage at issue could not be classified as "physical injury" or "loss of use." *See supra* at 14, 17. Yet, assuming *arguendo* there was "loss of use," any loss of use would have occurred as a direct result of negligence during the construction process, not by some force post-construction. Thus, the erstwhile property damage "occurred" while Erwin performed operations on Woodsboro's real property. *See Cook*, 438 F. App'x at 318 (finding the exclusion j(5) applicable when the property damage at issue was the completion of a well at an incorrect depth, which was considered damage arising out of a contractor's operations); *Malone v. Scottsdale Ins. Co.*, 147 F. Supp. 2d 623, 628 (S.D. Tex. Feb. 1, 2001) (finding the j(5) exclusion applicable where damage occurred, in part, from contractor's failure to properly construct and install various components of a structure, and that the damages arose from the contractor's operations).[14]

Woodsboro argues that the exclusion in (j)(5) is only applicable to "that particular part" of the property on which work was being performed. Because it is "seek[ing] coverage not for the

[14] To the extent that Woodsboro relies on *Lennar*—a Texas Court of Appeals case later abrogated by a Texas Supreme Court decision—the language cited is still unhelpful to its argument. Woodsboro quotes: "[A]lthough defective construction may constitute an 'occurrence,' the insurer indemnifies the insured only for resulting 'property damage' arising after the project is completed." *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 673 (Tex. App.—Houston [14th] 2006), *abrogated by Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010). As the Court earlier points out, the damages sought in this action are for the repairs and replacement of the defectively constructed silos, defects which arose during rather than subsequent to the silo's construction.

bolts that AJ failed to tighten, but [sic] the roof components that were damaged by wind and weather as a result of AJ's failure to secure the bolts," its damages claim would not be excluded from coverage. (Dkt. 103 at 16.) Woodsboro cites to the Fifth Circuit's opinion in *Garner*, which held that the plain language of the (j)(5) exclusion "bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only non-defective work by the insured and were damaged as a result of defective work by the insured on other parts of the property." *Garner v. Nautilus Ins. Co.*, 2017 WL 1134142, at *7 (S.D. Tex. Mar. 27, 2017) (citing *Mid–Continent Cas. Co.*, 557 F.3d at 215).

Yet, Woodsboro's reliance on *Garner* is misplaced. In *Garner*, the insured was hired to repair certain parts of a boat's hull, which it failed to do, negligently damaging other parts of the hull in the process. *Garner*, 2017 WL 1134142, at *7. In contrast, Erwin was hired for the complete construction of the silos. This included proper installation of side and roof panels. Thus, the entirety of the project can be said to be the subject of defective work of Erwin and AJ. Woodsboro's argument is similarly undercut by the damages awarded to it by the Arbitration Panel. The Arbitration Panel specified that damages were awarded for: (1) deconstruction and reconstruction of grain bins; (2) electrical costs associated with grain bin reconstruction; and (3) lost profit. (Dkt. 126, Attach. 1 at 6.) Woodsboro is not seeking coverage for merely the "roof components that were damaged by wind and weather," but for the entire reconstruction of its property.[15] (Dkt. 103 at 16.) The damages awarded for deconstruction and reconstruction of grain

[15] Woodsboro also argues that the roof was "nondefective work" that was damaged due to defective work elsewhere on the silos. This argument is rebutted by Woodsboro's own engineer, who testified at the deposition "there were some skirt panels over the roofing panels, and these had some pieces of sheet metal that were not properly fitted. The majorities [sic] of these gaps were

binds and electrical costs associated with grain bin reconstruction fit squarely within the exclusion of I(2)(j)(6)—"[t]hat particular part of any property that must be restored, repaired or replaced."

The third type of damages award by the Arbitration Panel against Erwin were a direct result of the lost profit Woodsboro incurred because of the untimely construction. This "lost profit" award is not "physical damage" to a property, but it *is* the type of damages explicitly excluded under Section I(2)(m)(2) because it "arose" from the delay in completion of the silos. *See* (Dkt. 1, Attach. 4 at 11). Under Section I(2)(m), (Exclusions—Damage to Impaired Property or Property Not Physically Injured) the Policy also excludes coverage for "property damage" to "impaired property" (or property that "has not been physically injured") arising out of:

> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(Dkt. 1, Attach. 4 at 12.) In sum, the types of damages awarded by the arbitration panel are ones explicitly excluded from the Policy's coverage.

**C. Are there any applicable exceptions to the policy exclusion?**

The Court has already found that the Policy does not cover the damages awarded against Erwin and that even if it had, that there are applicable exclusions that remove the damages sought from the scope of coverage. Nonetheless, the Court will briefly analyze the Policy exclusion exceptions.

Section I(2)(j) includes one potentially relevant exception: "Paragraph (6) of this exclusion does not apply to property damage included in the products-completed operations hazard." (Dkt.

filled with open cell expanding foam. . . . " (Dkt. 99, Attach. 7 at p. 68.) This evidence demonstrates that the roof itself was defectively constructed by Erwin.

1, Attach. 4 at 12) (internal quotations omitted). Section V(16) of the Policy defines "Products-completed operations hazard" as including:

> [a.] all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> (1) Products that are still in your physical possession; or
>
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> (a) When all of the work called for in your contract has been completed.
>
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(*Id*. at 21.) The damage to the silos was not on property Erwin rents or owns and arose from his work away from his premises. Furthermore, his work was "completed," as repairs and replacement of the silos do not, under the Policy, effect the status of the contract as being complete. Thus, the exception to I(2)(j)(6) negates the applicability of Section I(2)(j)(6)'s exclusion in this case.

By contrast, the exclusions of Section I(2)(j)(5) and (m) have no applicable exception to bring the damages excluded back under the Policy's coverage. *See* (Dkt. 1, Attach. 4.) The exception to (m) is only applicable after "your work" is "put to its intended use." (*Id*. at 12.) As the defective silos were never put to its intended use, this exception is inapplicable. Section (j) only includes one exception applicable to (j)(5): "Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement." (*Id*. at 12.) This insurance dispute does not involve a sidetrack agreement. Thus, no exception to the exclusions in (j)(5) or (m) would bring the silo damage back into the Policy's coverage.

## **Conclusion**

Woodboro did not suffer any "property" damages, as defined by the Policy. But even if the damages were considered a type of "loss of use" property damage, the Policy's exclusions place Woodsboro's injuries outside the scope of TIG's duty to indemnify, and the Policy's exceptions to the exclusions do not bring the damage back in the scope of coverage. Accordingly, the Court finds that summary judgment should be entered in TIG's favor. TIG's Motion for Summary Judgment (Dkt. 99) as to its duty to indemnify is therefore GRANTED, and Woodsboro's Counter-Motion for Summary Judgment (Dkt. 103) is DENIED.

IT IS SO ORDERED.

SIGNED this June 23, 2023.

Diana Saldaña
United States District Judge